My name is Daniel Blank, and I represent the Defendant Appellant in this case. Your Honors, the errors by the District Court in failing to suppress unconstitutionally obtained statements, in permitting improper expert testimony, and in failing to ameliorate the prosecutor's misconduct during closing argument denied Mr. Younger a fair trial. And due to the prejudicial effect of these errors, this Court should vacate his convictions and remand for a new trial. I'll begin with the Miranda issue, Your Honors. There were two sets of statements in this case, one at the residence and one at the police station. And in each case, the District Court erred in presuming an implied waiver of Miranda rights. It's undisputed that the officers did not obtain in either instance an express Miranda waiver. Instead, what happened at the residence is that the officer read one set of questions from the front of his card, informing Mr. Younger of his rights and asking him if he understood, but declined to read him any of the questions from the reverse side of the card, which include the questions regarding whether Mr. Younger was interested in waiving his rights. The facts in the record are only that Mr. Younger understood his rights and that eventually statements were obtained from him. Now, it's certainly true that waiver may in some circumstances be inferred from actions and words by a defendant short of an express waiver, but the law is clear that you cannot infer an implied waiver merely from the fact the defendant understood his rights and that a statement was ultimately obtained. That's the Cheely case by this Court. Instead, what this Court has done is proceeded in a two-step analysis beginning, and this is in the Cazares case. The first question is whether... Let me ask you this. The record, it could sort of cut both ways, but your client, you know, part of it could be interpreted that your client's a little bit savvy about what his rights are from the standpoint that I think at the... Well, you've got... He seems to pretty... All right, so first you have at the residence... Well, I guess before they Mirandize him, he takes response... He says he doesn't want the backpack to be blamed on his girlfriend, so he said, that's mine, she don't know nothing about it or something along those lines. That's actually incorrect, Your Honor. It was after he was informative with Miranda Rights that he said that, I believe. What happened was that there was a show up at the window and the officer made an accusation to him saying, that's his... That's the guy through the backpack, he was brought downstairs, read his Miranda Rights, and then before any waiver and before any express questioning, I think that's what maybe Your Honor is referring to, is before a direct question, he volunteered, that stuff belongs to me, effectively. Wasn't that the end of the case? It's not at all, Your Honor. First of all, that was in response to the functional equivalent of questioning. Okay. I don't see that. Well, Your Honor, if I can explain how... Later, but I want to... The point where he seems kind of savvy that I want you to talk about, when he's at the police station later, he says, you know, he's already said some things and they've Mirandized him again, and he says, but excuse me, if I'm right, I can't have a lawyer present. That was an unequivocal indication of the rights of counsel, Your Honor. He does say that. That's correct. Okay. That's one way you can look at it, but I'm asking you to sort of tell me why we shouldn't look at it the other way and say, yeah, he heard what they were saying, he knew he could have someone present, and he didn't, you know, he still kept on talking. My citation to authority would be to the Alvarez case, and the Alvarez case held that this is an objective test, and the three statements that were in that case, each of which this court held constituted the unequivocal indication of the rights of counsel, is substantially similar, in fact, undistinguishable from the statement in this case. In Alvarez, he says, can I get an attorney right now, man? You can have an attorney right now, and well, like, right now you got one? All of those are unequivocal indications of the rights of counsel this court held. Saying, but excuse me, interrupting the police officers as they're tape recording this, but excuse me if I'm right, I can have a lawyer present through all this, right? That is an unequivocal indication of the rights of counsel. But how did the lower court look at that statement? Obviously didn't buy your argument, or we wouldn't be here, right? Indeed. But before I answer that question, if I can address Judge Noonan's question. Judge Noonan, you asked me how this can be the functional equivalent of interrogation. It is because even the statement itself is clearly in response to something. My client... In response to he's defending his girlfriend. That's correct, but what does he say? He says... I mean... Your Honor, if I can... He voluntarily, you use the word yourself, he voluntarily had a statement to clear her. What he said was that stuff. So the question, exactly, he doesn't say, let me tell you, police officers, anything you find here belongs to me. He says that stuff. Now clearly that's in a context, otherwise it's a non sequitur. Right. Right, but they haven't asked him a question expressly. What they've done is had an officer accuse him of being the one to throw the backpack, which, Your Honor, by the way, is completely gratuitous. There was a warrant to search this house. There wasn't a question of identity. There wasn't a question at all. What this was, at a minimum, the interrogating officer should have known that under these circumstances. He should have seen that as an accusation and obtained an express waiver. It seems to me you've gone so far from the purpose of why we have Miranda warnings, to try to create an interrogation out of this, really an action scenario. He's there, he doesn't want his girlfriend accused, he volunteers a statement. It's very hard to see that as contrary to anything. Well, Your Honor, even if that were true, then the court would have erred, including any of the other statements that followed it. This did it. Once he admitted that, he was done for. On the contrary, Your Honor, and if you look through the record, it's very clear how the government tried to use the tape statements and how much they used these all through the trial and in closing to show not just possession, which, if Your Honor is correct, would be shown by that statement, but intent to distribute. In fact, the intent to distribute was the only contested issue at trial in light of the court's rulings. What was the quantity? What was the quantity? Twelve grams, Your Honor. And the government's expert admitted that a heavy user could use up to seven grams per day. And there was undisputed testimony in the record that my client was a heavy user. So it's well within the realm of possibility, and I think not proved beyond a reasonable doubt, although the jury disagreed with me, that this was used for simple possession, for his own use, not to distribute. Well, what were the errors that contributed to them finding that it wasn't for his personal use? Very good, Your Honor. The first error was admitting these statements. Even if you could admit this one statement about that stuff belongs to me, admitting all the other statements after interrogation begun without a waiver in the residence and then certainly after the unequivocal invocation of the right to counsel at the police station. And by the way, even if the court found that it was an equivocal, an ambiguous invocation of the right to counsel, the officer still violated the Constitution by doing more than ask clarifying questions. Now, Judge Callahan, you asked me, well, what did the district court do? The district court made an improper legal interpretation of the Supreme Court's decision in Davis. In Davis, there was a prior express waiver of Miranda rights, both written and oral by the suspect. And afterwards, the suspect made an ambiguous and equivocal invocation of the right to counsel. And the Supreme Court said that that was not enough to overcome his prior express waiver. Now, in this case, Davis does not apply because there was no prior express waiver. There was no express waiver orally, and there was no express waiver written. And this court in Chile made that distinction clear. In Chile, what happened is that the suspect was given a sheet of paper with two places to sign. The first place to sign says, do you understand your rights? The second place to sign says, do you want to waive these rights? The suspect says, I sign, I understand, but I'm not signing the part where I'm waiving. And Chile said Davis doesn't apply in that case because that's not a prior express waiver of Miranda rights. So that's where the district court went wrong with respect to the statements, applying Davis here where it just doesn't belong. And this court in Chile has explained why. But Chile is not what we're measuring the action of the state court by. It's a – well, all right, go ahead. Thank you, Your Honor. There's no state court. This is a direct appeal. It's a direct appeal. It's a direct appeal. Yes, Your Honor. Thank you. As the government frames the question in terms of whether it's an equivocal or unequivocal indication of the rights of counsel, the government has a three-part test. And we meet, actually – even if you follow the government's test, we meet every aspect of it. The government says there's nothing in the statement that suggests a desire. Well, the words he says are can have. And when you ask someone in authority whether you can have something, that's clearly an expression of desire. Mom, can I have a cookie? Is it okay if I can have a cookie? It's clearly that you want something under an objective test as ordinary people speak. The second prong of the government's test is whether there was a present desire. And what Mr. Younger says is through all this. It's obviously a present desire. It's not just some hypothetical time in the future. He wants it now through all this. And, in fact, then what he says is but excuse me. And when he interrupts the officers to say this, it's clear that using those words is a statement of disagreement. I'm not agreeing to this. But excuse me. If I'm right, I get a lawyer now. That's what he's saying. And none of the government's cases are to the contrary. As I was saying, Your Honors, even if it was merely an equivocal right to counsel, equivocal invocation of the right to counsel, all the officers could do is ask clarifying questions. Under this Court's authority, that's hoosh, Smith v. Intel, rob toy, grooms. It's clear that that's all the officers could do. They did much more than that. They just went right into interrogating him. And this Court has repeatedly held that merely re-advising the suspect of his rights is constitutionally inadequate. That's also Smith v. Intel, Alvarez, and Womack. So either way, what the officers did is wrong. And if the Court finds that the initial statement, that stuff belongs to me, is acceptable because it wasn't in response to interrogation, everything else still has to come out. All right. Now, let's say I think Judge Noonan delineated to you what was sort of the damning part of the first statement. Let's say I accept your argument for this moment that, well, I know you don't. You're not making the argument. But let's say the first comes in, but the second is out. How, if that were the case, why isn't the evidence still overwhelming against your client? Because it's evidence of what? Evidence of possession would be, but evidence of intent to distribute would not be. Instead, what happened is that through the interrogation at the police station, the officers, you know, kept Mr. Younger talking. You saw his gamely trying to defend himself. It's not working. They get everything out of him they want to get. But each little statement, implicitly statement, the government used during the trial, having the officers comment on it on direct examination, and then in closing to show that he actually had the intent to distribute these drugs. What in those statements was used to show his intent to distribute? Wasn't there also an expert? And, of course, Your Honor, I've objected to that. I know you've objected to that, but how did the expert's testimony come into the? The expert violated Rule 704B, and I know, Judge Noonan, you've had a lot of experience with this rule. What happened is that the district court granted my motion in limine under Rule 704B to preclude the expert from testifying about my client's intent. What was allowed is what this court allowed in Gonzales, which is to say that in a hypothetical situation, the typical person of typical amount of drugs or this amount of drugs, that is consistent with sales. That's not at all what the expert did in this case. The expert made a direct reference to the drugs in this case, saying, quote, the person, individual who possessed this, possessed it for the purpose of selling, over my objection. Moreover, the expert responded to detailed mirroring hypotheticals in which the prosecutor laid out every tiny little detail in this case, down to whether the drugs were in a backpack and with guns and whether they were loaded, and said, what does that tell you? And he says that was for sale. What this court said is that in Campos, if from the testimony it necessarily follows, the testimony is credited, that the defendant had the requisite intent, that violates Rule 704B. And over my repeated objection, that's what was allowed, notwithstanding the government's, I mean, the court's in limine. So are you saying that it actually, they said in this case, or are you saying that it was so similar to this case that essentially it looked like your client's picture was next to the hypothetical? Just on the latter, Your Honor, that would be enough to violate 704B. But they did the former. He said the drugs in this case were possessed with the intent to distribute. It's a clear violation of Rule 704B. I'm going to want to save a few minutes. Let me get one more issue before I would take a break. And that has to do with the vouching. And I'm not sure that this came through entirely in the cold record, but the district court was appalled at the government's misconduct during closing argument, threatened to clear the courtroom, which is something that doesn't often happen in front of a jury. What happened was each government counsel, there were two different ones, repeatedly made reference to the court's in limine decisions to admit my client's statements as somehow suggesting that the statements are more reliable, even though, of course, I questioned the voluntariness of the statements during the course of the trial. The district court was obviously very upset, and the jury could see that. The problem is that the district court didn't give a curative instruction that I requested. And so the jury had no way of knowing why the district court was so upset, what it was about the government's vouching that was so problematic. But from the context that happened before those references to the in limine motions, the vouching was just overwhelming. The government counsel said, quote, the government believes that he did possess cocaine and cocaine base for sales purposes. And then seconds later kept saying, we know. We know the facts to be true. And the government counsel didn't do this just once or twice. Government counsel did it six times just before then going on and making reference to the in limine rulings. So in this context, and finally, Your Honors, the closing argument melded these two things, the statements that had been gone over in intricate detail for proof of intent to distribute, with the impermissible expert testimony in the context of this vouching, together denied Mr. Younger a fair trial. Your Honor, if I may reserve the balance of my time. Thank you. Thank you, Your Honor. Good morning. Good morning. May it please the Court, Susan Geraght on behalf of the United States. Can you hear Judge Jones? Yes. Thank you. Okay. Keep your voice up. Thank you. With respect to the waiver issue at the residence, the district court made factual findings, as I believe this Court has noted, that it was the defendant's intention in protecting his girlfriend, who was the only other occupant of the household when officers executed the search on the date in question. It was the defendant's intention to exculpate her. And therefore, the first thing that happened factually is Mr. Younger was detained. He was brought to a window in the back of the house and identified. At this time, the backpack was not within Mr. Younger's view. It was not inside the house. It was on top of the roof where officers had observed Mr. Younger throw it. Second, Mr. Younger was brought down into the living room where he was mirandized and left alone. He wasn't questioned immediately. The officers left him alone. The officers were searching the living room. Mr. Younger spontaneously stated, the stuff in the bag is mine. She don't know nothing about it. Subsequent to that, the officers asked some follow-up questions about the bag, and a short time thereafter, in fact, brought the bag they'd retrieved from the roof into the room and asked Mr. Younger, is this the bag? Is this what you're talking about? Yes. The district court properly concluded and made specific factual findings that there had been an implied waiver because, one, Mr. Younger had been mirandized. He understood his rights. There was no evidence that he was under the influence or in any way handicapped, so it was not to understand them. And he elected, he initiated by way of spontaneous statement his conversation with the officers. Second, Mr. Younger was then brought down to the Bayview police station. The tape recorder was turned on. The officers were identifying themselves, at which point Mr. Younger said, but excuse me if I'm right, I can get a lawyer through all this right. The officers didn't prevaricate. They didn't mislead him. They said, yes, if you want one, let us mirandize you, which they did. Subsequently, the first thing the officers said to Mr. Younger was, now let's talk about the bad, let's talk about the woman, at which point, and the district court also utilized this in her findings, Mr. Younger said, yes, yes, and began describing in some way. But they never said, do you understand these rights? Do you give up these rights? Having these rights in mind, do you want to talk to us? That's correct, Your Honor. They didn't say it the first time, and they didn't say it the second time. That's correct. But as the court is aware, and I believe the district court also noted, there's no requirement under Davis, under any authority, that there be an express waiver taken. That is only that the defendant be advised that he acknowledge he understands his rights, which is what the evidence is in this case, and that he give a knowing and voluntary waiver of those rights. So if I understand your argument correctly, your interpretation or the district court's interpretation that you're asking us to accept is when he talked about having a lawyer, was really a statement of the fact that he understood what they had just told him? That's correct, Your Honor. As opposed to asking for a lawyer. That's correct, Your Honor. And the case cited by Counsel Alvarez and some of the other cases that the circuit has considered, for example, De La Hara, the statements there, and Alvarez thrice repeated statements, which seemed very unequivocal. Here you have a question which Officer Benzinger stated he interpreted as the defendant explaining that he understood his rights. And the district court found that as well from some of the later statements, which I believe the court alluded to earlier, that Mr. Younger made during the course of his interview at Bayview Police Station. For example, if I may, at excerpts of record, page 17, the officers ask Mr. Younger about the green backpack. Mr. Younger says, the bag, I don't know about the bag. We'll talk about that in front of a lawyer or something. I don't want to say anything that will incriminate myself in court. You know what I'm saying. And there are additional statements, such as this one, indicating that insofar as the conversation concerned him generally speaking about the incident and or exculpating his girlfriend, Ms. White, which again is what the district court specifically found, he was talking. When the conversation got closer to perhaps inculpating Mr. Younger, he elected not to answer certain questions, thereby demonstrating that he clearly understood his rights and chose to exercise them selectively. I think you've covered that aspect of the case. How about going to the prosecutorial behavior? It was the same prosecutorial behavior I encountered when I sat in the court in October from the same office about this closing argument of what we know, and especially egregious what the government believes, which I think in any advocacy 101, you know you cannot say such things. And the conduct of the prosecutor in referring to the court's instructions, I mean the court's holdings on a legal matter, going around trying to get around the 704 issue by just putting it into a backdoor approach of what you can't do through the front door, of asking the person to assume the hypothetical facts that match exactly the facts in the case. I'd be more interested to know about what in the world is going on in this prosecution office with a case where you have clear evidence of a person being identified as throwing a bag out and being picked up, drugs are identified, and then they start into this sort of behavior. I'd like to hear your justifications for those. Judge Jones, I just want to make sure that the prosecutor understood your question because I was having a little bit of trouble with some of it. Do you understand the question? There were three parts to it. I'm talking about the prosecutorial behavior. Number one, as to what they're trying to do with the expert in bringing out what constitutes a violation of 704, or at least raises that issue. And then also for the behavior of the prosecutor in quoting the court's ruling on a legal matter and finally to discuss the basic statement in the closing argument of the government believes such and such. I'd like to have an explanation of that sort of prosecutorial behavior. Okay, thank you. Thank you, Your Honor. Taking your questions in turn, Judge Jones, with respect to the argument regarding prosecutorial misconduct, the issue is whether or not there was trial court error. And I submit to this court there was not. The first statement that the court referenced, the government believes, that was one isolated statement. It was immediately objected to, sustained, and the prosecutor rephrased her remarks. The overall looming issue is whether or not any of these statements that we're going to discuss now amounted to the defendant, Mr. Younger, not receiving a fair trial. And again, because there was no trial court error, because this district court judge was vigilant in jumping in, if you will, when she saw or perhaps even perceived there to be any opportunity for error or unfairness to the defendant, I submit to you, sir, that any of these errors, the government believes, the remark that counsel referred to, we know, et cetera, and the later statements with respect to the court's rulings was cured. And even if this court were to disagree, any error was harmless due to the curative instruction given by the court and the strength of the government's case. If I may. What about the instruction that counsel for the appellant indicated that he proffered and was not given? And, Your Honor, I believe counsel is referring to when the prosecutor made the comment relating to gatekeeper, the court's gatekeeper function. There was no objection. The court immediately moved in on her own and admonished counsel. At that point, defense counsel indicated he wanted an instruction on the prosecutor's improper use of the terminology we know. The district court declined to do that saying, making the specific finding, that she understood we know to be a reference to the evidence collectively. So I believe that's the only point at which the district court did not, in fact, provide some sort of curative measure instruction. So there's not an instruction in the record that was proffered that I can look at that was? Your Honor, I'm going to direct you actually to, there is a, pardon me, there is a in the record instruction. I'll provide you the citation in a minute. It's in the reporter's transcript, volume 5, page 66. And the court says this, and this is after my colleague, Mr. Shockley, who doesn't really get anything out other than the court ruled. The court says this, ladies and gentlemen, you ultimately will be the determiners of all facts that are presented to you and all issues that are raised. So that in this instance, to the extent that there were any remarks made by the defendant or by the officers themselves that bear in any way on his state of mind, as you view it in reviewing his interview on tape, you may consider those. Ultimately, the decision will be yours as to the significance of anything that he did say in the course of that. So it's the government's position then that based upon the court's vigilance and stepping in where she felt it was appropriate or she was asked, any sort of missteps made by the prosecution were cured. And in the event this court disagrees, any error was harmless, given the fact that there were corrective measures, and this was, after all, a very strong case. From your standpoint, tell me what the evidence was that goes beyond just possession for personal use and where in the trial, you know, where it comes from. Obviously, the statement, there's the initial statement about it's not the girlfriend, she doesn't know nothing about it, that sort of thing. That doesn't go to beyond personal use. It goes to possession. So where is the evidence and which of the errors that are being assigned, what part of the trial does that go to? With respect to the evidence indicative of personal use. Beyond personal use, because obviously he's convicted beyond that. I'm sorry, pardon me. This was a backpack recovered from the roof that had two compartments. In one compartment were two operable real firearms and then a very good replica of a submachine gun looking type firearm. In the other compartment were the narcotics. And I believe counsel referenced 12 and a half grams. There were, I believe, 81 individually wrapped pieces of crack cocaine and then there was some amount of cocaine powder in base. Also there was a mask and I think a knife and some other items in that same backpack. Moreover, as the court indicated, the government's narcotics expert, Lieutenant Crenshaw, testified. Okay. So that packaging and those quantities and the relative location to guns is separate and apart from the expert testimony? That's correct. So you have the physical evidence, which I think in and of itself is fairly indicative of somebody who is perhaps not just this is not a personal use type of scenario. You have a weapon or weapons in this case and that quantity wrapped and packaged as they were, I think, is fairly suggestive of something more than personal use. Adding to that was, of course, the narcotics expert who did testify. In Judge Rogers' suit, to get back in part to your question, Lieutenant Crenshaw, the government's narcotics expert, numerous times on his own during direct examination, upon inquiry from the court, and even under cross-examination, indicated that he had absolutely no knowledge as to the defendant, Clyde L. Younger, or the defendant's activities on the date in question. Every hypothetical was properly posed and answered. Not once did Lieutenant Crenshaw refer to the defendant personally or specifically. Everything was very generalized, such as counsel referred to the person, not Mr. Younger. There was plenty of evidence in that record left so that the jury, whose, of course, job it is to ultimately infer intent in that situation, that was their province and that's the way the state of the record was left. Unlike the case cited by counsel Compos, which this court concluded that with that expert testimony, there would not have been any room for inference. Okay, so the expert testimony says if you have this, if you have that, all of those things, that would not be indicative of personal use but would be indicative of sales. What about counsel for the appellant said that in his second challenge on the Miranda, he said that there's something about those questions. What about those questions goes to possession for sale? I would actually disagree with counsel, and I think it was counsel in either his opening brief or reply brief stated that in the taped statement, which occurred later at the Bayview Station, Mr. Younger made, I'm paraphrasing, but something like one ambiguous comment about having packaged those narcotics himself. In fact, that interview, the key statement was the spontaneous statement at the residence because all that the later statements at the Bayview Police Station did was they were almost cumulative because they were talking about the same things, the guns and the drugs and other issues, in a little greater detail but nevertheless the same topical areas. I think once the statement was made at the residence as to possession of the guns and drugs, that was fairly overwhelming at that point. All right. But did what in that second statement, you said, what did he say about packaging? I believe, Your Honor, he made one fairly ambiguous statement in response to a question about, yeah, I packaged those or something to that effect, and I can find the exact quote for the court. I don't have it before me, but I can. All right. That's fine. If there are no further questions from the panel. Judge Jones, do you have any further questions? No, thank you very much. And apparently Judge Noonan does not either. Thank you. Thank you. Thank you, Your Honor. Just if I can briefly respond. The error with respect to the vouching was in the failure to give a curative instruction that dealt with vouching. I didn't get one when I objected with respect to the we know following the first invocation or reference to the government's courts in limine ruling. But if you think about what the court did say and the government counsel read it, at least in part, it doesn't say anything about vouching. It says the jurors are the ones that find the facts, but it doesn't talk about what facts they can consider and not consider. Can they consider what the government counsel has just told them about their knowledge, about any extrinsic evidence that they know, about the court being a gatekeeper? That's what was missing, and that's why the vouching is a problem, notwithstanding the fact that the court responded so vehemently on a personal level to what the government counsel had done. The expert testified with respect to the court. Do you really think that influences juries from the standpoint that I think that it's pretty inherent to the process that I agree with you a little more on the court, but I think that juries expect counsel to believe in their case. I know that they're not supposed to vouch for witnesses. I understand that. But how much does that really affect the outcome? Well, this court has held that it's actually potentially very dangerous, and particularly in a very close case like this one. Don't forget that Mr. Younger was acquitted on Count 3, which is functionally inextricable from Counts 1 and 2. Count 3 was a 924C, use of a gun in furtherance of a drug trafficking crime. Does that help you or hurt you? I think it helps me. Well, but if it's really so damaging, why didn't they just nail him on everything? Well, I think the jury might have split the baby, and I think it's in light of what they heard during the vouching as well as the expert witness testimony. But what the expert said, and the government counsel made reference, for example, to the facts that the guns were near the drugs. The expert said that the guns, the presence of the guns, actually has no bearing on whether the drugs were for personal use or not. This is what he said in cross-examination. He also agreed that the packaging could be, with respect to some heavy user, would buy a lot at once if he could afford to buy it at once. And the government's expert himself brought up the issue of Costco. And so you go to Costco, it's cheaper, it's safer when you're buying drugs on the street, to buy a whole bunch at once. And if a dealer had wrapped them up all individually, that's how you would get them. The expert kept referring to the person, this person, the drugs in this case, the person in this case, not a typical person. And that's what's erroneous and what's different from Gonzales, where this court approved of hypothetical questions relating to a typical person. There's no way the jury could have thought that he was referring to anybody else, especially in light of the statements that were admitted. The government counsel, I think, mistakenly misconstrues the record with respect to what the statement was, the initial statement in the residence. He doesn't say the stuff in the bag. That would be much better for the government's position if he had. But this is Excerpt to Record 28. He says that stuff. It's clearly in a context of an accusation with respect to the backpack. He wouldn't have phrased it that way if there's any question about them understanding what he was talking about. The government counsel also says that, well, they Mirandized him again, and that should be sufficient. I've already cited the cases that show that that's not sufficient. Finally, again, I think there was just an inadvertent misstatement of the record. The statement, but excuse me if I'm right, that statement was before he was Mirandized at the police station, not after. So it's not him just confirming that he understands it. He's the one who's saying, wait a minute, guys. I'm not agreeing with this. I want a lawyer through all this. It would have been much better for the government's case if that's what it had been. It's not. Well, he didn't exactly say what you said either. I'll quote it again. He says, but excuse me if I'm right, I can have a lawyer present through all this. Right? That's what he says. Finally, Officer Benziger's understanding of whether he was trying to invoke counsel or not is not relevant. It's an objective test, not a subjective test. But if it were relevant, Officer Benziger admitted on cross-examination that he was eager to get Mr. Younger to speak to him without a lawyer because he thought it would be an easier way to get more incriminating information from him. To the extent that the court wants to consider the policy arguments like that, I think it should consider all of them and that what these cops were eager to do was to get him to talk without a lawyer, and that's just what he did. And although he tried at times to sort of say, wait a minute, back off, he was unsuccessful, and there's not a single question that they wanted to know that he didn't ultimately answer. Any further questions? No, just a final comment. As I said in October to the same office, I hope that they have an inter-office memo prohibiting their prosecutors from using the we know argument. Thank you. Respectfully, it may take more than that, Your Honor. Thank you. Thank you, Your Honors. All right. Thank you both for your argument, and this matter will now stand submitted. The court at this time will briefly recess to reconstitute the panel, and we won't be out very long, so don't go too far. Thank you.
judges: Noonan, Callahanones